UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:11-CV-00115

ANITA GALE                                                          Plaintiff

v.

LIBERTY BELL AGENCY, INC.,                                          Defendants
and
NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PENNSYLVANIA

**MEMORANDUM OPINION**

This matter is before the Court upon Defendants Liberty Bell Agency, Inc. and National Union Fire Insurance Company of Pittsburgh, Pennsylvania's Motions for Summary Judgment.  (Docket Nos. 21 & 22.)  Plaintiff Anita Gale has responded, (Docket No. 23), and Defendants have replied, (Docket No. 26).  The Court also granted Defendants leave to file a supplemental brief in support of their Motions, which they did, (Docket No. 29), and to which Plaintiff has responded, (Docket No. 31).  Fully briefed, this matter is now ripe for adjudication.

For the reasons that follow, the Court will GRANT Defendants' Motions for Summary Judgment.  An appropriate Order of dismissal will issue separately with this Opinion.

BACKGROUND

The instant bad-faith action between Plaintiff Anita Gale (Gale) and Defendants Liberty Bell Agency, Inc., (Liberty Bell) and National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union) (collectively Defendants) arises from a motor vehicle accident that occurred on March 12, 2009.  On the day of the accident, Gale, a court reporter in Paducah, Kentucky, was driving her sport-utility vehicle southbound on South 7th Street in Paducah.  At the same time, Bradford[1] Thomure (Thomure) was driving a tractor trailer westbound on Kentucky Avenue.  At the intersection of 7th and Kentucky the two vehicles collided.  The police report reflects that Gale and "all of the witnesses stated that [Gale] had the right of way and [Thomure] ran the red light on Kentucky Ave."  (Docket No. 21-1, at 2.)  That report also reflects that Thomure maintained "that he had the green light and that [Gale] ran the red light."  (Docket No. 21-1, at 2.)  After the accident, Gale was taken to the hospital where she underwent several surgeries.  (Docket No. 23, at 1.)

Many of the facts relating to the collision remain in contention, despite that the underlying damages suit has since been settled.  Primarily, the parties disagree as to the drivers' respective degrees of fault.  Gale acknowledges that she "saw the defendant's truck before impact," but not "in sufficient time to avoid impact."  (Docket No. 21-2, at 12.)  She states that "as the front of [her] vehicle drove into the intersection, the back wheels of the trailer plowed into her," and insists that her "vehicle did not do the striking;

---

[1] Although Liberty Bell refers to Mr. Thomure as "Bradley" in its present Motion, the remainder of the record appears to indicate that Mr. Thomure's correct first name is "Bradford."

it was struck when the rear wheels crushed into its driver's side."  (Docket No. 23, at 1.) Regardless, the Court need not resolve the parties' competing characterizations of the accident; relevant here is simply that disagreement as to the drivers' respective fault exists.

At the time of the accident, Thomure and Central Transport, the trucking company whose truck he was operating, were insured under a policy written by National Union.  The claim was administered by Liberty Bell as a third-party claims administrator pursuant to a claims servicing agreement.  It appears that National Union played no role in the claims process and instead that Liberty Bell was wholly responsible for handling, evaluating, and adjusting the claim.

In a March 20, 2009, faxed letter to the Liberty Bell's claim adjuster, Pamela Lagodna (Lagodna), counsel for Gale, attorney David Oakes (Oakes), sent notice of his representation of Gale and that she had undergone surgeries on her knee and shoulder and would likely require further knee surgery in the future.   (Docket No. 25-3, at 4-5.) Oakes' March 20 letter stated:

> On March 12, 2009, your insured's truck driver, Bradford Thomure, drove through a red light and ran over my court reporter (and friend) Anita Gale. . . .
>
> It is our experience that commercial truck drivers who cause collisions like the one in this case are generally impaired in some way and have violated various federal safety regulations.  Because of this experience, **we anticipate that we will be filing suit in the near future and request that you transmit to your insured immediately, my demand that they preserve all records**

> **relevant to the movements and activities of their driver within**
> **six months preceding the crash**. . . .

(Docket No. 25-3, at 4-5 (emphasis in original).)  Then on March 25, Oakes again wrote

to Lagodna requesting, among other things, copies of all applicable insurance policies

and declaration sheets indicating the limits of liability coverage.  (Docket No. 25-3, at 7.)

In response to Oakes' March 20 letter, Lagodna wrote to Oakes on March 27 requesting

the opportunity to interview Gale. [2]  (*See* Docket No. 21-22, at 2.)  Oakes responded to

Lagodna's March 27 letter on April 2, stating:

> I do not see any point in arranging a meeting between my client
> and an adjuster who would be working for a company that is
> owned by a company that is owned by another company that is a
> sister company of the company that employed Bradford Thomure.
> I believe the police report and the Central Transport, Inc., records
> referred to in my original retention request should tell you
> everything you need to know about the scope of Central
> Transport's liability.

(Docket No. 25-2, at 32.)  Oakes enclosed with that letter copies of Gale's treatment

records and medical bills in an amount just over $55,000.00.  (*See* Docket Nos. 25-2, at

32-49; 25-3, at 1-3.)  Oakes also advised that Gale had been told she would need further

knee surgery in the future and that she was expected to miss a substantial amount of time

from work.

---

[2] Liberty Bell identifies Lagodna's March 27 letter as "Exhibit G" appearing at Docket No. 21-7; however, that exhibit appears to have omitted the actual letter, as it contains only a March 27 fax cover sheet and a copy of the police report.  (*See* Docket No. 21-7, at 1-2.)  Regardless, subsequent correspondence by Oakes corroborates the date and relevant contents of that letter.  (*See* Docket No. 25-2, at 32-34.)

On July 8, 2009, Lagodna again wrote to Oakes requesting to take Gale's recorded statement.  (*See* Docket No. 25, at 11.)  Then on July 21, Gale filed suit against Thomure and Central Transport in McCracken Circuit Court, and the case was subsequently removed to this Court on August 12.  *See* Notice of Removal, *Gale v. Cent. Transp. Int'l, Inc.*, No. 5:09-cv-148 (Docket No. 1).  Litigation proceeded in that case with the Court setting the first scheduling conference for October 1 and the defendants filing notice on October 21 that they would depose Gale on December 15.  *See* 5:09-cv-148 (Docket Nos. 6; 8).  Gale responded to the defendants' interrogatories and requests for production on January 4, 2010.[3]  (*See* Docket Nos. 23, at 7; 21, at 2.)  And on January 12, Gale's deposition was taken.  (*See* Docket No. 21-3.)

Then on January 15, 2010, the defendants produced to Gale a "Certificate of Liability Insurance."  (Docket No. 25-3, at 25.)  Despite erroneously identifying the insurers providing coverage as Cherokee and New Hampshire Insurance Companies, the

---

[3] In her Response, Gale states that she "itemized her medical bills, and set forth damages clearly exceeding $1 million."  (Docket No. 23, at 7.)  But the only exhibit she provides is a single page from her responses to the defendants' interrogatories, identified as "Liberty 281," which corresponds to Docket No. 25-2, at 28. The full set of her responses has been provided by Defendants as their "Exhibit B" to the instant Motion at Docket No. 21-2.  But her response to their request for medical records and bills indicates only that "All such medical records and bills in Plaintiff's possession will be produced under separate cover."  (Docket No. 21-2, at 17.)  Gale does itemize her claimed damages as $120,000 in medical expenses incurred up until January 4 and $1,000,000 in future medical expenses; pain and suffering through the date of trial not to exceed $1,000,000 and in the future not to exceed $2,000,000; $49,073 in lost income; permanent impairment not to exceed $750,000; and punitive damages up $2,000,000.  (Docket No. 21-2, at 8.) However, Gale has failed either to produce any documentation to support these figures or to point the Court to its location in the record.  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record  . . . ."); *see also Shelton v. City of Taylor*, 92 F. App'x 178, 183 (6th Cir. 2004) (noting that even considering the evidence in the light most favorable to the plaintiff, unsubstantiated allegations will not defeat summary judgment). Therefore, the Court finds nothing in the record to verify Gale's assertion that she provided documentation on January 4, 2010, "set[ting] forth damages clearly exceeding $1 million."

certificate correctly notified Gale of the applicable $1,000,000 policy limit.  (*See* Docket Nos. 23, at 7; 25-3, at 25.)  This error regarding the named insurer was subsequently corrected, [4] and Oakes testified in his deposition that because the erroneously and correctly named companies were both owned by the same parent company, he saw "no real distinction" between them and did not think the confusion formed a basis for a bad-faith claim against Liberty Bell.  (*See* Docket No. 25-5, at 109-111.)

On March 2, 2010, defendants' counsel, attorney Richard Hughes (Hughes), met with accident reconstructionist Pete Curless at the scene of the accident and spoke with two witnesses, Sherry Newton and Dan Corley, who were working at a store on the corner of 7th and Kentucky the morning the incident occurred.  (*See* Docket No. 25-2, at 25.)  Then on March 4, Thomure's deposition was taken.  (*See* Docket Nos. 23, at 8; 25-2, at 1.)  A March 17 letter from Hughes to Lagodna recounts that Thomure testified he entered the light at 7th and Kentucky on green and was surprised when he realized contact had been made between his trailer and Gale's vehicle.  (*See* Docket No. 25-2, at 21.)  Then on April 2, depositions were taken of witness Newton; Paducah police officer Anthony Copeland, who came on the scene shortly after the accident occurred; and Ronald Culp (Culp), a witness who was driving alongside Thomure's truck and who saw the accident take place.  (*See* Docket Nos. 23, at 8; 25-2, at 12-16.)  In correspondence to Lagodna dated April 6, Hughes summarizes Culp's testimony as "appear[ing] extremely

---

[4] In a "Supplemental Document Response," counsel for the defendants informed Gale that the previously produced Certificate of Liability Insurance, which had been provided to the defendants by the insurance agent, was in fact a carryover from 2008 and that the correct insurer providing coverage at the time of the accident was National Union, but that the $1,000,000 policy limit previously identified in January 2010 remained correct.  (*See* Docket Nos. 26, at 4; 26-1.)

confident" that "the light turned red as [Thomure] entered the intersection."  (Docket No. 25-2, at 14, 16.)  Hughes also recites Culp as testifying "he saw Anita Gale, who seemed to be paying attention to the road, for some inexplicable reason, go through the intersection and hit the tractor-trailer in the rear tandem."  (Docket No. 25-2, at 14.) Additionally, Hughes characterized Copeland's testimony as "not helpful" because his "recollection was generally limited" and Newton's as "wavering a great deal, but [that it] came back to the theme that she could not understand why Anita Gale would go through the intersection when the tractor-trailer had passed nearly completely through the intersection when the contact was made."  (Docket No. 25-2, at 13, 16.)  Hughes also noted the need to find and interview two other witnesses, Christy Parm and Keno Allen, who were walking down 7th Street at the time of the accident.  (Docket No. 25-2, at 16.)

Gale sent her first settlement offer to National Union on April 13, 2010, in which she offered to settle her claims against Central Transport for $3,000,000.  (Docket No. 25-2, at 10.)  A Liberty Bell claims diary note from May 13 records the following in relation to a conference among Hughes, Lagodna, and George Gerges (Gerges), another Liberty Bell claims adjuster and manager:

> Discussed facts of claim, including liab[ility] – says inv[estigation] thus far indicates there is a 2 second overlap on the red lights both ways.  [Hughes] is trying to get the light sequencing records on it.
>
> He will review file and will get recommendations for settlement value over to me shortly, so we can determine offer.  Says he will also send a letter to [Oakes] tomorrow advising him of situation and addressing the gray area of future med[ical]s (as [Oakes] apparently also has commented . . . that he does not have a firm idea of $ futures, etc.)

(Docket No. 25, at 9.)   Hughes then responded to Oakes the following day, May 14, rejecting the $3,000,000 figure and noting, "I understand Ms. Gale's interest in attempting to resolve this matter at an early stage in the litigation, but based on her own testimony, there are questions regarding future medicals and liability, and therefore, additional information and evaluation of that information is needed before a counter-offer to your $3 million demand can be made."  (Docket No. 25-2, at 6.)  Specifically with respect to the liability issue, Hughes wrote:

> [T]here are questions with regard to liability in this matter.  I have requested additional information from the city and state with regard to the sequence of the lights in question, i.e., 6th and Kentucky, 7th and Kentucky, and 7th and Broadway, and I have not received that information nor a response to my request with regard to the date of the incident.  Also, it is undisputed that your client hit the rear tandem axle of the trailer portion of Brad Thomure's tractor-trailer resulting in her vehicle turning on its side.  Based on Ms. Gale's deposition, she indicated that the air bags did not deploy.  This is not a case where the Central Transport tractor-trailer hit Ms. Gale in the side.

(Docket No. 25-2, at 7.)

Then on June 11, 2010, witnesses Parm and Allen were deposed.  (*See* Docket Nos. 23, at 10; 25-2, at 2.)  Correspondence between Hughes and Lagodna indicates that Hughes thereafter spoke with Oakes on November 10 regarding scheduling deadlines.  (*See* Docket No. 25-2, at 1.)  Hughes wrote that Oakes "agreed that we needed to adjust the deadlines with regard to discovery and as to dispositive motions because he has not received a report from his expert, presumably an accident reconstructionist."  (Docket No. 25-2, at 1.)  Hughes' letter goes on:  "I then started a discussion as to moving this

case along to determine its value and perhaps do a mediation or settlement conference. [Oakes] seemed receptive to that, although he stated that he thought this was a very good case to try on behalf of the plaintiff." (Docket No. 25-2, at 1.)

A January 5, 2011, note in Liberty Bell's claims diary reflects that Gerges had become concerned with using Thomure, who was no longer employed by Central Transport, as a witness. (Docket No. 25, at 8.) Gerges also noted:

> I would like to see a more reasonable value than 3 Million to try and negotiate. Plaintiff has delayed many times in the course of case, [s]uch as computer crashed, etc. The case does not appear to be one of over 1M in value.
>
> The claim has good value, but they are too high. Apparently they want to make this a punitive damage case which seems improper.

(Docket No. 25, at 1.) Then on January 10, Gale's expert accident reconstructionist, Thomas Rottinghaus, was deposed. (*See* Docket No. 21-5.) Liberty Bell's claims-diary notes following that deposition reflect Lagodna's entry: "To our favor, Acc[ident] Recon[structionist] did say [Gale] would have entered intersection on red light . . . . Again mentioned the 2-sec. overlap on l[i]ghts which makes that possible." (Docket No. 25, at 3.)

Next, on March 28, 2011, Oakes emailed Hughes, stating: "I see no obstacle to the defense providing some meaningful response to the requests for settlement that I transmitted . . . in April, 2010. In view of the materials and information I transmitted with that letter, I think they have enough information to evaluate the claim, and I do not think that requests for more information are an adequate response." (Docket No. 25-3, at

16.)  Oakes went on:  "I will most likely be filing a complaint for bad faith/unfair claims practices in the near future, and if the companies would like to have some hope of avoiding that, they should act quickly to address these matters."  (Docket No. 25-3, at 17.)  Hughes wrote back the following day on March 29, stating he still lacked medical records from two of Gale's doctors and also responding to an apparent phone conversation he recently had with Oakes:

> In our last phone conversation, you accused me of not responding to your demand of $3 million in this case.  I believe that I wrote you on 14 May 2010 with regard to supplementing your medical records and obtaining additional information as to the possibility of any future procedures. . . .
>
> There are also questions regarding fault in this matter and the fact that your client hit the rear tandem of the trailer and that your own expert has your client entering the intersection on red.  We are currently trying to set this matter for mediation, and I believe that both parties will try to be reasonable under the circumstances so that we can have a productive mediation.

(Docket No. 25-3, at 18.)  Hughes wrote to Oakes again on March 30, stating in regard to settlement:  "I have indicated in my two previous letters my request for additional medical information and discussed factual disputes regarding the case. . . . Given the questions surrounding medical treatment, additional medical records, and facts surrounding liability, this case is a difficult one to evaluate."  (Docket No. 25-3, at 15.)  In that same paragraph, Hughes noted that the parties had mediation scheduled with Rick Walter on May 2, stating:  "I find it difficult to negotiate when the parties have agreed to mediate the case. . . . My hope was to begin settlement negotiations with Rick Walter, but if you insist, we can provide a number to you, but it would be with the *caveat* regarding

the unknowns and disputes as to liability." (Docket No. 25-3, at 15.)   With that, Hughes

extended a counteroffer of $200,000. (Docket No. 25-3, at 15.)

On March 31, 2011, the defendants' expert Curless was deposed. (*See* Docket

No. 21-4.)   And on April 27, 2011, Gale's treating orthopedic surgeon, Dr. Burton

Stodghill, was deposed. (*See* Docket No. 25-3, at 11.)

Liberty Bell's claims diary reflects that mediation was tentatively scheduled for

May 2 as early as March 15, 2011. (*See* Docket No. 25, at 2.)   Mediation was in fact

conducted on May 2, and the parties reached a settlement agreement under which the

defendants would pay Gale $984,920, which amounted to the balance of remaining

available coverage under the policy. (*See* Docket Nos. 23, at 14-15; 21-22, at 5; 25-3, at

8-9.)  Gale then filed the instant bad-faith claim in McCracken Circuit Court on June 13,

2011, and Defendants removed the action to this Court on June 29. (Docket Nos. 1; 1-3.)

## STANDARD

Summary judgment is appropriate where the pleadings, the discovery and

disclosure materials on file, and any affidavits show "that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must

resolve all ambiguities and draw all reasonable inferences against the moving party.  *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Still, "A

party asserting that a fact cannot be or is genuinely disputed must support the assertion by

. . . citing to particular parts of materials in the record . . . or showing that the materials

cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 796, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of her position; she must present evidence on which the trier of fact could reasonably find for her.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a properly supported motion for summary judgment:  "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisitions Corp.*, 681 F.3d 312 (6th Cir. 2012).

Finally, while the substantive law of Kentucky is applicable here pursuant to *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity applies the standards of Federal Rule of Civil Procedure 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W2d 476 (Ky. 1991)."  *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993), *abrogated on other grounds by Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010).

DISCUSSION

Generally, Kentucky's Unfair Claims Settlement Practices Act (UCSPA), Ky. Rev. Stat. § 304.12-230, "is intended 'to protect the public from unfair trade practices and fraud' and 'imposes what is generally known as the duty of good faith and fair dealing owed by an insurer to an insured.'"  *Phelps v. State Farm Mut. Auto. Ins. Co.*, 680 F.3d 725, 731 (6th Cir. 2012) (2-1 decision) (internal citations omitted) (quoting *State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988); *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 515 (Ky. 2006)), *rehearing and rehearing en banc denied*, (Aug. 23, 2012).  An insurer's violation of the UCSPA creates a cause of action both for the insured as well as for those who have claims against the insureds, and the same standard applies in both types of cases.  *Id.* (citing *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky. 1999)).

In order to state a claim under the UCSPA, a plaintiff "must meet a high threshold standard that requires evidence of 'intentional misconduct or reckless disregard of the rights of an insured or a claimant' by the insurance company that would support an award of punitive damages." *Id.* (quoting *Wittmer v. Jones*, 864 S.W. 2d 864, 890 (Ky. 1993)); *see also United Servs. Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003) (describing the requisite threshold as "high indeed").  In *Wittmer v. Jones*, the Kentucky Supreme Court specifically described the standard as that of "outrageous" conduct by the insurer.  864 S.W.2d at 890.  Once a plaintiff has met this initial showing, she must establish three elements to maintain a claim of bad faith:

> (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Wittmer*, 864 S.W.2d at 890; *accord Phelps*, 680 F.3d at 731; *Glass*, 996 S.W.2d at 452.

As the Sixth Circuit recently noted in *Phelps v. State Farm Mut. Auto. Ins. Co.*, "the second and third elements of this test depend on evidence similar to the threshold inquiry." 680 F.3d at 731. The *Phelps* court went on to quote a 2000 opinion by the Kentucky Supreme Court, *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 376 (Ky. 2000), which stated: "The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonable and either knew or was conscious of the fact that its conduct was unreasonable." 680 F.3d at 732. The Sixth Circuit found it confusing that the Kentucky Supreme Court in *Farmland* spoke of a "lower standard of 'unreasonableness'" that will obviously be met if a plaintiff "has first met *Wittmer*'s higher standard of 'reckless disregard.'" *Id.* at 733. But ultimately, the Sixth Circuit concluded that under Kentucky law a plaintiff still "has to meet *Wittmer*'s higher threshold standard." *Id.*

The *Phelps* court's confusion on this point is understandable. But a rereading of *Farmland* in light of *Phelps* informs the conclusion that the Kentucky Court did not intend to supplant *Wittmer*'s threshold inquiry with a lower standard of "unreasonableness." *See Phelps*, 680 F.3d at 732 ("We acknowledge that the Kentucky

cases still recognize *Wittmer*'s punitive-damages standard . . . ."). The *Phelps* court's quoted language from *Farmland* appears in that case as a direct quote from the Supreme Court of Arizona and in the context of analyzing the second element of *Wittmer*'s three-part test. *See Farmland*, 36 S.W.3d at 375-76 (quoting *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000)). More specifically, the Kentucky Court relied on the Arizona Court's decision solely to support its conclusion that "although elements of a claim may be 'fairly debatable,' an insurer must debate them fairly"; that is, "an insurer is not thereby relieved from its duty to comply with the mandates of the [Kentucky] UCSPA." *Id.* at 375. The Kentucky Court's discussion in this regard was not aimed at the *Wittmer* threshold inquiry, but rather to clarify that because a claim may be fairly debatable does not absolve an insurer of the duty to debate it fairly and in accordance with the UCSPA. *See id.*

Gale argues that *Farmland* "provided additional detail into what was required as proof at the threshold summary judgment stage," and that *Farmland* "described the threshold standard as 'unreasonableness.'" (Docket No. 31, at 3, 5.) Based on its analysis of *Farmland* and *Phelps* above, the Court disagrees with Gale's contention here. This conclusion is supported by a number of Kentucky decisions since *Farmland*. *See, e.g.*, *Hamilton Mut. Ins. Co. of Cincinnati v. Buttery*, 220 S.W.3d 287, 293 (Ky. Ct. App. 2007) (citing *Wittmer* to conclude that "A cause of action for violation of the UCSPA may be maintained only where there if proof of bad faith of an outrageous nature"); *Bult*, 183 S.W.3d at 186 (citing *Wittmer* as establishing the need for proof that "there was conduct that is *outrageous*, because of the *defendant's evil motive* or his *reckless indifference* to

the rights of others" (internal quotation marks omitted) (emphasis in original)); *Ison v. GEICO Gen. Ins. Co.*, 2006 WL 2382721, at *3-4 (Ky. Ct. App. Aug. 18, 2006) (citing *Wittmer* as requiring "sufficient evidence to warrant punitive damages" and "of outrageous behavior" as a threshold for asserting a statutory bad-faith claim).   The Court's conclusion on this point is also supported by a very recent decision, albeit unpublished, by the Sixth Circuit since *Phelps*.  *See Nat'l Surety Corp. v. Hartford Cas. Ins. Co.*, 2012 WL 4839767, at *3-4 (6th Cir. Oct. 9, 2012).

In the Sixth Circuit's recent unpublished decision in *Nat'l Surety Corp. v. Hartford Cas. Ins. Co.*, the court, applying *Wittmer* and *Bult*, and quoting cases from this District and the Eastern District of Kentucky, held:

> Kentucky's standard is high. . . . Bad faith "is not simply bad judgment.  It is not merely negligence.  It imports a dishonest purpose of some moral obliquity.  It implies conscious doing of wrong. . . . It partakes of the nature of fraud."
>
> The Kentucky Court of Appeals reaffirmed the high evidentiary threshold in bad faith actions against insurers in [*Bult*].  *Bult* identified *Wittmer* as the definitive case governing bad faith actions, and noted that for a bad faith claim to proceed to a jury, evidence sufficient to support an award of punitive damages against the insurer must exist.  The "[e]vidence must demonstrate that an insurer has engaged in outrageous conduct toward its insured. . . ."  "Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury."

2012 WL 4839767, at *3 (internal citations omitted) (quoting *Bult*, 183 S.W.3d at 186) (citing *Matt v. Liberty Mut. Ins. Co.*, 798 F. Supp. 429, 433-34 (W.D. Ky. 1991); *Winburn v. Liberty Mut. Ins. Co.*, 8 F. Supp. 2d 644, 647 (E.D. Ky. 1998)).   The parties here disagree over *Nat'l Surety*'s applicability to this case and its effect (or lack thereof) on

*Phelps*.  (*See* Docket Nos. 29; 31.)  Although Gale correctly points out that "even if the *National Surety* case was a published opinion, a subsequent panel cannot overrule the *Phelps* panel's published opinion," (Docket No. 31, at 1),[5] this Court does not read *Nat'l Surety* as attempting to overrule or necessarily conflicting with *Phelps* on the fundamental issue of whether *Wittmer*'s high threshold standard applies.

The *Phelps* court expressly acknowledged the vitality of *Wittmer*'s high threshold standard.  680 F.3d at 733.  And after concluding that a reasonable jury could find that the *Phelps* plaintiff had satisfied *Wittmer*'s threshold inquiry, the court proceeded to address whether she had presented sufficient evidence to raise a genuine factual dispute and thus stave off summary judgment.  *See id.* at 733-35.  The *Nat'l Surety* decision differed insofar as it relied primarily on *Wittmer* and *Bult* (which was decided in 2003, three years after *Farmland*) to find that the plaintiff had failed to satisfy *Wittmer*'s "high evidentiary threshold."  2012 WL 4839767, at 3-4.  But ultimately, both *Phelps* and *Nat'l Surety* continued to apply *Wittmer*'s high threshold standard—a position consistent with recent Kentucky decisions and the controlling law in Kentucky courts.  Therefore, the Court does not read *Nat'l Surety* as incongruous with *Phelps* and, in light of those decisions and the Kentucky case law they apply, finds that *Wittmer*'s threshold requirement remains the relevant controlling inquiry for bad-faith claims under Kentucky law.

The principal issue for purposes of the instant Motions is whether Defendants acted in good faith in handling Gale's claim, and, more specifically, in pursuing a defense

---

[5] Gale cites "Sixth Cir. Rule 206(c)" as authority for this proposition.  (Docket No. 31, at 1.)  However, the correct Rule should be 32.1; Rule 206(c) does not exist.

based on liability for the accident on March 12, 2009.   Liberty Bell argues that throughout the processing of Gale's claim it maintained its position that liability for the accident was fairly debatable and remained in question.   Despite that it ultimately settled Gale's claim for the policy limit, Liberty Bell insists that the evidence of record shows it was actively evaluating the claim "and that Liberty Bell's only motives for not paying [Gale's] claim were the ongoing liability investigation and fact-gathering" and outstanding questions regarding her need for future surgical operations.  (Docket No. 21-22, at 21.)   Liberty Bell further argues that Gale has presented "no evidence of malice, outrageous conduct, or reckless disregard for the rights of Ms. Gale" from which a jury could find that it acted in bad faith.  (Docket No. 21-22, at 18.)

Liberty Bell thus essentially divides its argument along two lines: (1) that Gale has presented no evidence sufficient to meet *Wittmer*'s threshold inquiry, and (2) that Gale cannot establish the second and third elements of *Wittmer*'s three-part test because Liberty Bell had a reasonable basis for delaying payment of her claim while it investigated liability.   Gale responds, arguing that "Liberty Bell extensively delayed investigation, evaluation, and attempts to settle [her] claim," and that Liberty Bell's position that liability was fairly debatable is a question of fact for the jury, which therefore precludes summary judgment.[6]  (Docket No. 23, at 20, 28.)

---

[6] Gale presents two additional arguments in her Response:  First, she argues that Liberty Bell's "advice of counsel defense does not entitle [it] to summary judgment."  (Docket No. 23, at 26-27.)  The Court agrees with Gale's proposition in this section of her Response that the insurer's duty of good faith under the UCSPA is nondelegable and continues during litigation notwithstanding that suit is filed.  *See Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 517 (Ky. 2006).  However, the Court does not read Liberty Bell as actually asserting this defense.  Regardless, because the Court finds its analysis of the parties' other

The Court finds that Gale has not satisfied the high Kentucky standard to proceed with her bad-faith claims against Defendants.  This conclusion is informed by the Court's review of the entirety of the parties' submitted exhibits, which includes:  Liberty Bell's claims diary, (Docket Nos. 21-16; 25); correspondence among attorneys Oakes and Hughes, and claims adjuster Lagodna, (*see* Docket Nos. 21-6; 21-7; 21-8; 21-10; 21-11; 21-12; 21-15; 21-17; 21-20; 25-2; 25-3); and deposition testimony by Gale, (Docket No. 21-3), Defendants' expert Curless, (Docket Nos. 21-4; 21-13), Gale's expert Rottinghaus, (Docket No. 21-5; 21-9), witnesses Newton and Culp, (Docket Nos. 21-18; 21-19), Gale's counsel Oakes, (Docket Nos. 21-14; 25-5), and Liberty Bell claims adjuster and manager Gerges, (Docket No. 21-21; 25-4).  In viewing these submissions in the light most favorable to Gale, and in drawing all reasonable inferences her favor, the Court is satisfied that she has failed to meet Kentucky's high threshold requirement for her bad-faith claims.

As previously stated, to survive Kentucky's high threshold requirement, Gale must show "evidence of intentional misconduct or reckless disregard of [her] rights by the insurance company that would support an award of punitive damages."  *Phelps*, 680 F.3d at 731 (internal quotation marks omitted).  Stated differently, she must show: "proof of bad faith . . . sufficient for the jury to conclude that there was 'conduct that is *outrageous*, because of the *defendant's evil motive* or his *reckless indifference* to [her]

---

arguments dispositive, it need not address further Gale's argument in this regard.  And second, Gale argues that National Union is not entitled to summary judgment because it "cannot escape liability by delegating its claims handling duties to Liberty Bell."  (Docket No. 23, at 32.)  Because the Court finds its analysis of Liberty Bell's Motion dispositive as to National Fire as well, it need not address further Gale's argument in this regard either.

rights . . . . This means there must be sufficient evidence of *intentional misconduct or reckless disregard of the rights of an insured or a claimant to warrant submitting the right to award punitive damages to the jury*." *Bult*, 183 S.W.3d at 186 (emphasis in original) (quoting *Wittmer*, 864 S.W.2d at 890). As the Kentucky Court of Appeals stated in *Bult*,

> The evidentiary threshold is high indeed. Evidence must demonstrate that an insurer has engaged in outrageous conduct toward its insured. Furthermore, the conduct must be driven by evil motives or by an indifference to its insureds' rights. Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury. Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice to support a claim for bad faith. Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown.

*Id.* Gale has made no such showing here.

Gale points to several facts she insists show the impropriety of Liberty Bell's claims handing. First, she posits that Liberty Bell extensively delayed its investigation, evaluation, and attempts to settle [her] claim." (Docket No. 23, at 20.) In this regard, she suggests that "Liberty Bell's claim file notes are indicative of an effort to 'document' the file to blame Oakes for the delay." Second, she reasons that despite her obvious pain and suffering, and "that she had missed extensive time from work, and was going to need future medical care," Liberty Bell's "belated" offer on March 30, 2011, "did not include any amounts for pain and suffering, past lost wages, or future medical expenses." (Docket No. 23, at 23 (emphasis omitted).) Gale further suggests that any "accusation that Oakes is to blame for making a demand three times the $1 million policy limit [i]n

April 2010 is illogical" because despite that Oakes requested this information in March 2009, the correct declarations sheet showing National Union as the insurer was not provided until April 2011.  (Docket No. 23, at 23.)  In this regard, she implies that, akin to *Phelps*, the Court should find an inference of bad faith from the insurer's "prolonged refusal to disclose policy limits, particularly after [Gale] made a demand that far exceeded the limit."  (Docket No. 23, at 24 (quoting *Phelps*, 680 F.3d at 734).)  Third, she argues that "[t]he structuring of the insurance policy, reinsurance, and third-party administrating in this case raises additional questions and lends support for the fact that Liberty Bell was purposely refusing to disclose accurate information because of the inter-relatedness of the companies."  (Docket No. 23, at 24.)  Fourth, Gale reasons that the Court should find Liberty Bell's March 2011 settlement offer indicative of bad faith as an attempt to "lowball" her claim, in view of Gerges' testimony regarding the amount of claim reserve set by Liberty Bell at that time.[7]  (Docket No. 23, at 25.)  Finally, Gale argues that the delay of some 25 months from the date of the accident until settlement also supports a finding of bad faith.  (Docket No. 23, at 26.)

Relevant to Gale's arguments, the Sixth Circuit in *Phelps* addressed a number of actions by the defendant-insurer that the court found amounted to evidence sufficient to satisfy both *Wittmer*'s threshold inquiry and three-element test.  Much of the evidence

---

[7] Gerges' testimony reflects that on March 12, 2009, Liberty Bell set the claim reserve at its standard opening amount of $2,500.  (Docket No. 25-4, at 66.)  That amount was increased on March 27, 2009, to $200,000, then on October 15, 2010, to $650,000, and finally to $992,420 on May 3, 2011, after a settlement was reached for that amount in mediation the day prior.  (Docket No. 25-4, at 66, 69.)

that the court found raised a genuine factual dispute is either comparable to or distinguishable from the facts here.

First, the *Phelps* court found that whether the insurer's initial offer was unreasonable presented a question of fact for the jury.  680 F.3d at 733.  There, the insurer's offer was at the low end of both its own evaluation and the plaintiff's documented costs, and did not account for the plaintiff's pain and suffering or future lost income.  *See id.*  On first glance, these facts appear analogous to Liberty's March 2011 offer to Gale.  Gerges' testimony evinces that as of October 2010, Liberty Bell had set its claim reserve at $650,000, which represented what Liberty Bell thought its exposure might be on Gale's claim.  (*See* Docket No. 25-4, at 68-69.)  Liberty Bell's tendered offer in March 2011 of $200,000 referenced incurred medical costs and lost earning capacity but did not reference pain and suffering, lost wages, or future medical expenses.  (*See* Docket No. 25-3, at 15.)  And, $200,000 was certainly well below the reserve Liberty Bell had in place at that time of $650,000.  However, Liberty Bell's offer carries several critical distinctions.  For one, mediation had already been scheduled for only a few weeks later.  With respect to this fact, Hughes noted, "I find it difficult to negotiate when the parties have agreed to mediate the case."  (Docket No. 25-3, at 15.)  Moreover, Hughes essentially disclaimed the amount of Liberty Bell's offer as being a function of the outstanding uncertainties and disputed facts between the parties:

> Given the questions surrounding the medical treatment, additional medical records, and facts surrounding liability, this case is a difficult one to evaluate.  My hope was to begin settlement negotiations [at the mediation], but if you insist, we can provide a

> number to you, but it would be with the *caveat* regarding the
> unknowns and disputes as to liability . . . .

(Docket No. 25-3, at 15.)  In light of this, the Court cannot infer that Liberty Bell's March

2011 offer represented Liberty Bell's attempting to "lowball" Gale's claim in the same

manner at the *Phelps* insurer.  Instead, Liberty Bell's offer suggests more so an effort to

appease Gale's counsel Oakes by basically "throwing out a number," albeit low, that took

into account the outstanding uncertainties and disputes between the parties.  Further, in

March 2011 the parties had agreed to a mediation set for May 2, 2011.  Hughes made

reference to this mediation in his response to Oakes' request that Defendants make a

settlement offer.  Thus, even in drawing all reasonable inferences in Gale's favor, the

Court does not find that Liberty Bell's actions in regard to its March 2011 offer present a

genuine issue of fact sufficient to satisfy *Wittmer*'s high threshold standard.

Second, the *Phelps* court found that a sufficient factual basis existed for a jury to

find that the defendant-insurer exhibited bad faith in the "extensive delay of nearly three

years before [the plaintiff's] claim was settled."  680 F.3d at 733.  There, the court

acknowledged that the first seven or eight months of the claims process "may be

attributed to the time needed for a reasonable investigation," but found troubling the

insurer's six-and-a-half month delay thereafter in requesting plaintiff's medical records

from another injury she suffered several years prior.  *See id.* at 734.  Particularly, the

court noted "some evidence of general delay tactics" where the insurer raised the prior-

injury issue just as the plaintiff submitted her settlement package.  *See id.*  In light of the

facts from *Phelps* and the court's reasoning, the facts of this case simply do not suggest

the same sort of "general evidence of delay tactics" or "questionable delays in the

processing of [Gale's] claim." *See id.*   Liberty Bell requested Gale's recorded statement shortly after the accident and again several months later—both prior to Gale filing suit on July 21, 2009.  (*See* Docket Nos. 21-22, at 2; 25, at 11.)  Gale responded to Defendants' interrogatories and requests for production in January 2010, and Defendants were unable to interview Gale until her deposition was taken on January 12, 2010.  (*See* Docket Nos. 23, at 7; 21-3.)   In the following months, Liberty Bell retained an expert accident reconstructionist, contacted witnesses, and deposed Thomure.   Liberty Bell's claims diary reflects that questions regarding liability arose at the outset of the claims process and amplified in the wake of Gale's deposition.   Moreover, the record reflects that as of November 2010, Gale was still awaiting the report of her own expert, who was not then deposed until January 2011.  Further, Gale's treating surgeon was not deposed until April 2011, less than one week before mediation was conducted and her claim settled.   The record also indicates that Liberty Bell had legitimate uncertainty as to Gale's need for further surgery.  (*Compare* Docket No. 25-2, at 9-11 (April 13, 2010, correspondence from Oakes noting the possibility of additional shoulder surgery); *with* Docket No. 21-11, at 1 (November 11, 2010, correspondence from Hughes to Lagodna relaying Oakes informing him that Gale's physician decided no additional shoulder surgery would be required).   In sum, the evidence of record shows that Gale's claim was continually evaluated by Liberty Bell and impresses the Court that Liberty Bell's principle motive for not paying her claim was its ongoing investigation regarding liability.   Furthermore, the uncertainty as to Gale's future medical needs does not support the inference that Liberty Bell implemented delay tactics tending toward bad faith, but rather, as it puts it, "that the

investigation of both liability and damages was evolving throughout the litigation." (Docket No. 21-22, at 21.)  Therefore, even in drawing all reasonable inferences in Gale's favor, the Court does not find that Liberty Bell's actions in this regard present a genuine issue of fact sufficient to satisfy *Wittmer*'s high threshold standard.

Third, the *Phelps* court found an inference of bad faith arose from the defendant-insurer's "prolonged refusal to disclose its policy limits, particularly after [the plaintiff] made a demand that far exceeded the limit."  680 F.3d at 734.  The court went on to reason that even if an insurer were not obligated to disclose its policy limits, its failure to promptly offer them once it knew that the reasonable value of the claim exceeded those limits "could support an inference that [the insurer] was not attempting to negotiate in good faith."  *Id.*  This reasoning is distinguishable from the facts of the present case for several reasons.   One, although Gale makes much of the fact that she requested Defendants' policy information in the initial notice of representation on March 25, 2009, she cites no authority to suggest that the Defendants were obligated to disclose those limits at that point, particularly before the onset of litigation or a settlement offer was made.  Unlike the situation in *Phelps*, the record here does not reflect that Defendants knew or should have known that a reasonable evaluation of the claim was in excess of the policy limit; in fact, the evidence of record shows that Defendants never evaluated the claim at an amount above the policy limit.  Therefore, under the court's rationale in *Phelps*, Defendants' failure to offer its limits does not support a similar inference of bad faith here.  And two, this is not a case where Defendants failed to disclose their policy limits "after [Gale] made a demand that far exceeded that limit."  *See id.*  Certainly,

Gale's initial offer of $3,000,000 exceeded the $1,000,000 policy limit.  But the record shows that Gale knew of the $1,000,000 limit by mid-January 2010, approximately three months before she made her $3,000,000 settlement offer.  (*See* Docket No. 25-3, at 25.) Although, as discussed above, the Certificate of Liability erroneously named the prior year's insurer, it nonetheless correctly showed the applicable policy limit as $1,000,000. As Oakes essentially conceded in his deposition, this error would not have affected Gale's notice of the relevant policy limit.   (*See* Docket No. 25-5, at 109-111.) Accordingly, in light of the *Phelps* court's reasoning on this point, Defendants' actions in regard to the disclosure of its policy limits does not support an inference of bad faith in handling Gale's claim, and therefore does not present a genuine issue of fact sufficient to satisfy *Wittmer*'s high threshold standard.

Finally, the *Phelps* court found evidence of "troubling claims-handling practices" by the insurer, and faulted the district court for failing to consider the reports of two of the plaintiff's expert witnesses—one a "national claim handling expert" and the other the CEO of a risk-management firm—who both had addressed specifically the insurer's claims-handling practices and their compliance with the UCSPA.  *See* 680 F.3d at 729-30, 735.  Gale latches onto this portion of the *Phelps* decision to argue that "[s]imilar to the reports of the experts in *Phelps*, the opinion of Oakes is thorough, supported by facts in the record and his expertise as a lawyer handling injury claims, and creates issues of fact concerning Liberty Bell's compliance with the UCSPA."  (Docket No. 23, at 32.)  The Court is not so persuaded by this analogy.  As Defendants argue in their Motion in Limine, Oakes was neither disclosed as an expert witness nor identified as an expert in

claims-handling policies and procedures.  (*See* Docket No. 46, at 1.)   Gale effectively would have the Court afford a plaintiff's attorney's opinion whether the defendant complied with the UCSPA sufficient weight so as to establish a genuine factual dispute and thus satisfy *Wittmer*'s threshold requirement.   The Court cannot oblige her in this regard.[8]

      *Phelps*, *Nat'l Surety*, and Kentucky case law are clear that in order to prevail on a UCSPA bad-faith claim a plaintiff "must meet a high threshold standard that requires evidence of 'intentional misconduct or reckless disregard of the rights of an insured or a claimant' by the insurance company that would support an award of punitive damages." *Phelps*, 680 F.3d at 731 (quoting *Wittmer*, 864 S.W.2d at 890 (describing this standard as that of "outrageous" conduct by the insurance company)).   *Nat'l Surety*, although an unpublished decision, correctly states Kentucky law on this point:

> "[I]n order to survive a motion for summary judgment, a plaintiff in a bad faith action must come forward with evidence, sufficient to defeat a directed verdict at trial, which reveals some act of conscious wrongdoing or recklessness on the part of the insurer." *Matt v. Liberty Mut. Ins. Co.*, 798 F. Supp. 429, 434 (W.D. Ky. 1991). Kentucky's standard is high. Plaintiffs alleging bad faith must "prove ... conduct ... of such an arbitrary and reprehensible nature as to constitute bad faith." *Winburn v. Liberty Mut. Ins. Co.*, 8 F.Supp.2d 644, 647 (E.D. Ky. 1998) (quoting *Matt*, 798 F. Supp. at 433). Bad faith "is not simply bad judgment. It is not merely negligence. It imports a dishonest purpose of some

---

[8]  It should be noted that the Court has considered the testimony of the parties' respective expert witnesses Curless and Rottinghaus.  However, unlike the expert witnesses in *Phelps* whose testimony was directly related to the issue of bad faith, the testimony of the experts here is addressed to the issue of liability in the underlying suit.  As such, the Court finds this testimony relevant only insofar as it relates to the Defendants' position that liability remained in issue throughout Gale's initial lawsuit.

moral obliquity. It implies conscious doing of wrong.... It partakes of the nature of fraud." *Matt*, 798 F. Supp. at 433.

The Kentucky Court of Appeals reaffirmed the high evidentiary threshold in bad faith actions against insurers in *United Servs. Automobile Ass'n v. Bult*, 183 S.W.3d 181 (Ky. Ct. App. 2003). *Bult* identified *Wittmer* as the definitive case governing bad faith actions, *id.* at 186, and noted that for a bad faith claim to proceed to a jury, evidence sufficient to support an award of punitive damages against the insurer must exist. *Id.* The "[e]vidence must demonstrate that an insurer has engaged in outrageous conduct toward its insured. Furthermore, the conduct must be driven by evil motives or by an indifference to its insureds' rights." *Id.* Unless a plaintiff demonstrates this two-part standard, the claim fails. "Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury." *Id.* Insurer errors fail to meet this exacting standard. "Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice to support a claim for bad faith. Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of *malice* or *flagrant malfeasance* must be shown." *Id.* (emphasis added). In *Bult,* the court concluded that despite the insurer's failure to follow a "better" claims handling process, the insurer's actions did not "give rise to any reasonable inference that [the insurer] was motivated by evil design or reckless disregard for the rights of [the insureds]." *Id.* at 187–88.

2012 WL 4839767, at *3. *Phelps*, as noted above, acknowledged that high standard but found a reasonable jury could find that Phelps had met that standard. But here, in viewing the evidence in a light most favorable to Gale, the Court concludes a reasonable jury could not find that she has reached that standard.

Earlier, the Court recited the timeline of events from the accident on March 12, 2009 until settlement on May 2, 2011, at mediation. At the risk of sounding repetitive, a

short summary of key dates and events is important.  Gale was deposed on January 4, 2010.  On January 15, 2010, Gale was informed that the insurance policy limits were $1,000,000.  On April 13, 2010, she submitted an offer of settlement for $3,000,000.  There were numerous exchanges of letters, faxes, and e-mails between counsel, and numerous witnesses were interviewed and deposed.  This accident occurred at an intersection governed by a red light, and both drivers claimed the light was favorable to them.  The front driver's side of Gale's vehicle made contact near the rear wheels of the side of the trailer Thomure was pulling.  The facts presented supported an issue of liability sufficient that both parties employed accident reconstructionists.  On November 10, 2010, Oakes requested that they extend discovery deadlines because he had not received a copy of his reconstructionist's report, and Hughes agreed.  Gale's expert was deposed on January 10, 2011.  Apparently by March 15, 2011, the parties had agreed to mediate the case, and the matter was set for mediation before private mediator Rick Walter on May 2, 2011.  On March 25, 2011, Oakes requested that Defendants respond to Gale's offer of $3,000,000 and threatened to file a bad-faith claim.  Despite having rejected that offer on May 14, 2010, Hughes responded on March 29, 2011, noting there was uncertainty as to future medicals and that there remained an issue of apportioning fault.  Hughes followed with another letter on March 30, 2011, reiterating his March 29 concerns but offering $200,000 with certain *caveats*.  As noted, the parties settled on May 2, 2011 for $984,920, the balance of the remaining coverage.  Gale filed this bad-faith claim in McCracken Circuit Court on June 13, 2011, and Defendants removed it to this Court June 29.

The above represents a thumbnail sketch of the activity in this case from accident to settlement. In the experience of the Court, the pace of the suit was normal. The Court finds no evidence of intentional delay, "evil motives," or indifference to the claimant's rights. There is simply no evidence of outrageous conduct here.

Oakes was very professional, competent, and thorough in pursuing the claim on behalf of Gale. Depositions were taken, and contributory fault clearly became an issue. Oakes employed an accident reconstructionist to bolster his claim and hopefully diminish or eliminate any apportionment of fault. When the facts of the case were fully developed both parties agreed in March 2011 to mediate and a mediation conference was held on May 2, 2011. Reviewing the issues involved and the complexity of the medical information, there was no delay in prosecution of the case. Given those issues, it is clear to the Court that Oakes achieved a very favorable and extremely fair result for his client. This was certainly the result of his attention to the all the details of the case and fully developing the case for presentation at the mediation conference. It is equally clear to the Court that the evidence demonstrates neither that Defendants engaged in outrageous conduct nor in conduct driven by evil motives or an indifference to the claimant's rights.

Therefore, the Court finds that Gale has not met the requisite threshold to proceed with her bad-faith claims under Kentucky law. The record simply does not show any action or set of actions on the part of Defendants that even approaches the sort of outrageous or intentional misconduct, or reckless disregard for Gale's rights that would

support an award of punitive damages.  Because Gale has failed to establish sufficient evidence to satisfy Kentucky' threshold requirement, summary judgment is appropriate.

## CONCLUSION

For the foregoing reasons, Liberty Bell's Motion for Summary Judgment, (Docket No. 21), and National Union's Motion for Summary Judgment, (Docket No. 22), are GRANTED, and an appropriate Order will issue separately.

Further, because the Court's decision on the instant Motions disposes of this action, IT IS HEREBY ORDERED that all outstanding Motions in Limine, (Docket Nos. 42; 44; 45; 46; 47; 48), are DENIED as moot.

Date:

cc:      Counsel